IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 27, 2015 Session


STATE OF TENNESSEE v. MARK TRACY LOONEY


Appeal from the Circuit Court for Rutherford County
No. F-68273     Mitchell Keith Siskin, Judge

_____


No. M2014-01168-CCA-R3-CD – Filed April 7, 2016

_____


A Rutherford County jury convicted the Defendant, Mark Tracy Looney, of four counts of rape of a child, one count of felony child abuse, and one count of misdemeanor child abuse. The trial court ordered the Defendant to serve an effective sentence of fifty years in prison. On appeal, the Defendant asserts that the trial court erred when it: (1) denied his motions for mistrial; (2) denied his motion to suppress his pretrial statements; (3) refused to grant a new trial based upon the State's failure to provide a recorded statement by the victim; (4) admitted inadmissible testimony from an expert witness; (5) allowed a witness to refresh her memory by viewing a video recording; (6) determined that the evidence against him is sufficient to sustain his convictions; (7) failed to grant a mistrial in light of a juror's failure to disclose exposure to pretrial publicity; and (8) ordered consecutive sentencing. After a thorough review of the record and the applicable law, we affirm the trial court's judgments.


**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Heather G. Parker, Murfreesboro, Tennessee, for the appellant, Mark Tracy Looney.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Jennings H. Jones, District Attorney General; and Nathan S. Nichols, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**

# I. Facts

This case arises from the Defendant's interactions with his wife's children. The Defendant's wife had three children from a previous marriage, J.H., T.H. and A.H.[1] Together the Defendant and his wife had a child, J.L. Pursuant to a parenting plan, J.H., T.H., and A.H. stayed with their mother at the residence she shared with the Defendant ("the Looney residence"). It was during the Defendant's wife's parenting time with her children that the Defendant's alleged physical abuse of J.H. and T.H. and sexual abuse of A.H. occurred.

On July 3, 2012, a Rutherford County grand jury indicted the Defendant for four counts of rape of a child (involving A.H.), two counts of aggravated sexual battery (involving A.H.), and two counts of child abuse (involving J.H. and T.H., respectively). On August 8, 2012, the Defendant filed a motion to suppress his pretrial statements, and, after a hearing, the trial court denied the motion.[2] The Defendant's trial on these charges began on December 3, 2012, where the parties presented the following evidence: Bert McCarter, a Murfreesboro attorney, testified that the victims' father, ("Father"), who was divorced from their mother, the Defendant's wife, had contacted him approximately eighteen months prior seeking a restraining order and modification of the parenting plan involving J.H., T.H., and A.H. The restraining order was based upon allegations of the Defendant's physical abuse against J.H. and T.H.

Mr. McCarter testified that a temporary *ex parte* order was granted and fifteen days later a hearing on the restraining order was held and the request granted. Following the hearing on the restraining order, Mr. McCarter learned of additional allegations involving A.H. He could not recall the specific date but stated that "it was brought to [his] attention about some sexual allegations at some point." Mr. McCarter agreed that the petition contained an allegation of inappropriate touching by the Defendant and also by A.H.'s maternal grandmother.

Carla Davis testified that she was employed by Youth Villages and worked with "Specialized Crisis Services." She explained that in her work with Youth Villages she responded to crisis situations with children including "suicidal, homicidal, or psychosis." Ms. Davis stated that she met J.H. through crisis assessment and that he was eight or nine years old at the time. She recalled that J.H. presented with a "suicidal gesture" that had occurred at school. Ms. Davis met J.H. at the Middle Tennessee Medical Center emergency room to assess him. After meeting with J.H., Ms. Davis concluded that he

---

[1] We refer to minor victims in this case by their initials for privacy.
[2] The facts from the suppression hearing will be summarized in the relevant section below.

was "struggling with . . . changes in the family that were happening." Ms. Davis recommended counseling services that included the family participating in sessions.

On cross-examination, Ms. Davis agreed that her recommendations also included J.H.'s parents, Father and his wife, meeting with "the school staff the next day about bullying," a possible change of classrooms "to get [J.H.] away from [this other student]," and role playing with J.H. on how to inform his teacher he was being bullied. Ms. Davis testified that in her assessment she had identified conflict with school peers as an issue, in addition to conflict between J.H. and the Defendant.

J.H. testified that he was eleven years old at the time of trial and in the fifth grade. He stated that he lived with his father and step-mother.[3] He identified the Defendant in court as his mother's husband, his step-father. J.H. recalled the last time he had seen the Defendant during spring break of his third or fourth grade year in school. J.H. said that, during that spring break, the Defendant, the Defendant's wife, J.L., A.H., J.H., and C.H. all stayed at the Looney residence. J.H. described the sleeping arrangement saying that he and C.H. slept in a room together while A.H. slept "in the living room in the chair." The Defendant, his wife, and J.L. all slept in a bedroom together.

J.H. testified about an incident that had occurred one morning while staying at the Looney residence during spring break. The two boys had fallen asleep the night before while watching television but were to have turned off the television before going to sleep. The next morning, the Defendant came into the room where the boys were sleeping and "raised [J.H.] up by the neck." J.H. said that C.H. "tried to save" him but that the Defendant pushed C.H. down when C.H. attempted to intervene. J.H. said that, during this incident, he felt like he "was about to die" and was scared. At the time, Looney was using the computer in the other room. When the Defendant released J.H., J.H.'s head hit the wall "hard" making a "hollow sound." J.H. said that, after the Defendant released him, his neck still hurt "a lot."

J.H. recalled another occasion when the Defendant's wife, C.H., and he were "watching" J.L. while the Defendant cooked breakfast. J.L. was in his playpen but "somehow" got out and fell onto a toy truck. J.H. said that the Defendant was not angry with his wife but rather he became angry at J.H. and C.H. J.H. said that the Defendant kicked him in his stomach before he fled to the bathroom and that the Defendant kicked

---

[3] J.H. referred to his father and step-mother as "mom" and "dad" and his biological mother and step-father, the Defendant, as "Tammy" and "Tracy." It is clear from the record and questioning by the State that he refers to his stepmother when he says "mom." When asked why he referred to his biological mother as "Tammy" he stated "Because I don't really think of her as a real mom. Mom to me. Because all she really does is just eat, sleep, and watch T.V. and play computer."

3

and "threw" C.H., who "fell into the kitchen into the microwave and cabinets." J.H. confirmed that "no one" tried to help him during this incident.

J.H. testified about "[g]oing mushrooming" with the Defendant. He explained that he would go with the Defendant into the woods across the street or to another wooded area near "someone's" house to look for mushrooms. J.H. did not know ultimately what became of the mushrooms they picked, but he said that the Defendant would take the mushrooms "to someone's house." J.H. recalled on one occasion when the Defendant took only A.H. to look for mushrooms. J.H. said that he was "very worried" and "afraid [A.H.] might like get those spiky vines prickle her" or that she might get scratched on her face by twigs. J.H. said that the Defendant and A.H. were gone for a long time and "everyone" got worried. At some point "Mamaw" drove the Defendant's wife, J.H., and C.H. to the area where the Defendant and A.H. were supposed to be looking for mushrooms. J.H. and C.H. went a short way into the woods and unsuccessfully called out for the Defendant and A.H.. J.H. said that when the Defendant and A.H. did finally return, A.H.'s legs were "prickled by the thorny vines." J.H. recalled that this was the first and only time that A.H. went looking for mushrooms, and it was "the day before the last day of spring break."

J.H. testified that the Defendant treated A.H. and J.L. differently than he treated J.H. and C.H.. He said that the Defendant was "always very kind" to A.H. and to J.L. J.H. recalled an incident that occurred at school following spring break where he wrapped paper towel around his neck in the bathroom. He said that he did so because of bullying he encountered at school but also because he believed the Defendant might kill him. J.H. described the Defendant as "a very mean person, and not very caring to a lot of people." He agreed that he was scared of the Defendant "sometimes."

J.H. testified that he did not initially tell his father and step-mother about the Defendant grabbing him by the neck because he was fearful that the Defendant might "come after" him. He did tell his father and step-mother, however, after he was taken to the hospital following the incident at school. He said that, after his parents learned of the Defendant's abuse, he no longer had to go to the Looney residence.

C.H. testified that he was nine years old at the time of trial but had been seven years old during spring break of 2012. C.H. identified a photograph of the Looney residence, and he said that the Defendant, his wife, and J.L. lived at that residence. He said that his grandmother, "Claudia," would also "visit" the residence. C.H. described his relationship with the Defendant as "pretty good" until J.L. was born. When asked about the incident when the boys failed to turn off the television, C.H. said:

4

Well, one time I left the T.V. on. And me and my brother were going to sleep. My brother said for me to turn off the T.V. And so, . . . I forgot to. So, I went asleep and didn't.

And then I woke up the next morning. And my brother was being held by the neck by [the Defendant]. And I tried to save him, but I couldn't. [The Defendant] kept slapping me to the floor.

C.H. described the Defendant slapping him with the palm of his hand "hard" and in a "frustrated way." C.H. said that he felt "sad" and "angry" during this incident because J.H. was being held by the neck and it "probably hurt him."

C.H. identified a photograph of the bedroom that he and J.H. slept in while at the Looney residence. He said that A.H. slept in a chair in the living room. C.H. testified about another incident during which the Defendant asked him to watch J.L. J.L. was in his play pen but, as he tried to climb out, he fell and hit his head. The Defendant became angry with C.H. for the incident and kicked and punched C.H. in the stomach as a result. C.H. testified that the punching and kicking "didn't feel good at all." C.H. said that he was also seven years old at the time of this incident. He said that he did not tell the Defendant's wife about the incident because "she was sitting there laughing at me." During another incident when C.H. was supposed to be "taking care of" J.L., C.H. "fell out again," and the Defendant hit C.H. with a spatula and kicked J.H. Afterward, the Defendant warned C.H. not to tell anyone.

C.H. testified that the Defendant, J.H., A.H., and he would hunt for mushrooms together. He recalled one occasion when only A.H. went with the Defendant. He recalled "Claudia" driving the Defendant's wife, J.L., J.H., and him to the area near a neighbor's house where the Defendant and A.H. were supposed to be hunting for mushrooms, but they were unable to find them. As they sat in Claudia's car watching for the Defendant and A.H., the two appeared from the woods and everyone returned home. C.H. told his father and step-mother[4] two weeks later about this incident because he was afraid "it" would happen again.

C.H. testified that the Defendant and A.H. had a "good" relationship at first but "then it started to get where [A.H.] was getting closer to [the Defendant]. And it was sort of getting strange."

---

[4] C.H. also referred to his father and step-mother as "mom" and "dad" and the Defendant and the Defendant's wife, his biological mother, as "Tracy" and "Tammy." He explained that he called his step-mother "mom" because "she has been with me longer than Tammy."

C.H. testified that J.H. told him that he was being bullied by a boy at school and that he "choked himself with a brown paper towel." He said the incident at school with J.H. occurred after spring break 2012. He said that he did not return to the Looney residence after that.

On cross-examination, C.H. testified that "that summer" he had some difficulty with lying and stealing at home but denied that his father ever punished him with a switch or a belt for this conduct. C.H. agreed that he was not happy that J.L. took the Defendant's "friendship away" from C.H., but he said that his feelings about it "slowly weared away" and that he had come to enjoy playing with J.L.

On redirect examination, C.H. clarified that he had gotten in trouble for stealing food at school. He explained that he would get in the cafeteria line twice when he was only to go through the line once. He said that initially he did not think it was wrong to get more food at the school cafeteria but, after his father and stepmother spoke with him about it; he realized that getting in the line twice was wrong.

Caroline Patterson, a nurse practitioner, testified as an expert witness in the field of child sexual abuse. She stated that she worked for Our Kids Center, an organization that provided crisis counseling and forensic medical exams in cases where there were allegations of sexual abuse of a child. She stated that she had conducted approximately 500 examinations of children in cases involving sexual abuse allegations and testified regarding these types of examinations in Maury, Davidson, and Robertson counties. Ms. Patterson confirmed that she was the medical provider assigned to A.H.'s case. She said that working with the social worker, Denise Alexander, she collected A.H.'s medical history and then conducted a full medical evaluation of A.H., who was five years old at the time.

Ms. Patterson testified that initially a social worker met with A.H. to ask about health issues. A.H. disclosed that the Defendant "'put his private area on my private area'" multiple times until "white stuff came out." Based upon this information, Ms. Patterson thought a physical examination might reveal injury or infection. She also noted that this information alerted her to the possibility of sexually transmitted diseases. In addition to penile penetration, A.H. also described oral penetration, so Ms. Patterson also tested A.H.'s throat for possible infection. As to the penile penetration A.H. said that "'it hurted, but no bleeding,'" which, according to Ms. Patterson, increased the likelihood of injury having occurred. A.H. reported that this activity occurred when no one else was around and "'under the covers.'"

Ms. Patterson testified that the anogenital examination revealed no signs of acute or chronic trauma. She noted that this was consistent with the "vast majority of cases of

6

child sexual abuse." She explained that the genital area of the body is "very vascular" and often injuries have healed completely so that there is no residual sign of trauma. Ms. Patterson stated that a serious injury would likely heal in around six days but she would expect any injury to be healed in two weeks. She confirmed that she examined A.H. a little over a month after the last alleged incident of sexual abuse. Ms. Patterson confirmed that the results of the urine screen for gonorrhea and chlamydia and the oral culture for gonorrhea were all negative.

On cross-examination, Ms. Patterson testified that, out of the 900 or more children Our Kids examined in a year, only five percent exhibited "definitive proof" of a sexual assault. An indication of acute injury was more likely to be revealed if an examination occurred within seventy-two hours of the alleged incident. Ms. Patterson agreed that her report could neither confirm nor negate the possibility of sexual abuse.

A.H. testified that she was seven years old and in the first grade. A.H. identified a photograph of the Defendant's living room and pointed out the green chair where the Defendant "forced" his "private area" in her "private area." A.H. said that she was sitting in the Defendant's lap at the time and "it hurt in [her] private area." A.H. confirmed that she remembered talking to "another Ms. Nelson" about "what [the Defendant] did to her." She stated that she told Ms. Nelson about the incident in the living room where the Defendant put his penis inside her vagina and about another incident in the bedroom. About this other incident that occurred in the Defendant's bedroom, A.H. said "he forced me to pull my pants down so he could put his private area into mine." A.H. described the Defendant's penis as "peach" or skin-colored and said that the Defendant instructed her to lie down on his bed.

A.H. could not recall her age at the time of these incidents but said that it was before she began attending school. A.H. believed the incident in the bedroom occurred during summer and that the incident that occurred on the green chair in the living room occurred during spring break. A.H. recalled that she and her brothers stayed at the Looney residence for the entire week of spring break. A.H. said that the Defendant told her not to tell anyone about these incidents or he would be unable to see her again. A.H. said that she told the Defendant, "Okay," but she told her father and step-mother anyway because "it hurt," and she did not want it to happen it again.

When asked if she liked the Defendant, A.H. responded, "It depends." She stated that she did not "like it when he did the [private area] stuff that he did." A.H. recalled another incident when she and the Defendant were in "[the] back room," and the Defendant put his "private area" into her mouth. She said, "He took it out and white stuff came out." She said that the Defendant took an item of clothing and "wiped it up." A.H.

7

said that the Defendant also put his penis in her mouth in the living room of the residence.

A.H. testified about an incident that occurred during summer break when she and the Defendant went mushroom hunting together. A.H. confirmed that this was the only time she had gone mushroom hunting and that only she and the Defendant went mushroom hunting that day. A.H. stated that she could not recall anything that had occurred between her and the Defendant while mushroom hunting. She agreed that it had been a long time since she had talked about "these things" and that it would be helpful for her to watch the recording of the interview of her statements about her interactions with the Defendant. The defense objected to the State showing A.H. the recording to refresh her recollection. The State decided to proceed with testimony and not play the recording for A.H. at that time. A.H. maintained that she and the Defendant only hunted for mushrooms and nothing else occurred between the two while hunting for mushrooms.

Father, J.H., C.H., and A.H.'s father, identified the Looney residence in a photograph and stated that the residence was located in Rutherford County. Pursuant to the parenting plan, Father's children would visit their mother, the Defendant's wife, every other weekend and on certain school breaks.

Father testified that his children stayed with the Defendant's wife, pursuant to the parenting plan, during spring break of 2012. He recalled that his children returned home following spring break and returned to school on Monday morning. That Monday, he received a telephone call from the school principal notifying him that J.H. had tried to commit suicide by choking himself with paper towels in the bathroom. He said that, at the time, J.H. was nine years old, C.H. was seven years old, and A.H. was four years old.[5] He said that he immediately drove to the school where he spoke with Robin Newell, the principal, and Tim Jenson, an S.R.O. officer. Mr. Jenson informed him that J.H. must be taken to the emergency room for medical evaluation. Father then went to the nurse's office where J.H. was waiting. He described J.H. as timid and not very talkative when he first observed him in the nurse's office.

Father testified that he drove J.H. in his vehicle to the hospital, following Mr. Jenson, who was in a separate vehicle. During the drive Father asked J.H. about what had happened, but J.H. "really didn't have a lot to say." Medical personnel took J.H. to a room where a doctor and nurse examined him before determining J.H. was "medically cleared." While they were at the hospital, Carla Davis, of Youth Villages, also assessed J.H.'s condition. After assessing J.H., she spoke with Father and his wife, the children's

---

[5] The presentence reports provides a date of birth for A.H. that indicates that she was five years old in March 2012.

stepmother, in a private room. Based upon Ms. Davis's assessment and recommendations, Father believed it was important for J.H. to no longer have any contact with the Defendant and his wife. Father said that J.H.'s classroom assignment was changed following this incident, in part because some of his classmates had seen J.H. exit the bathroom with paper towels around his neck and, in part, due to bullying by a classmate.

Father testified that, following the incident at school, he sought counseling for J.H.. Father said that several days after the school incident, he and his wife talked with J.H. and C.H. about what had occurred. C.H. denied having ever seen someone at school bully J.H. but, during this conversation, Father said, "it was brought to our attention about [the Defendant]." Father said that he immediately contacted his attorney about what should be done.

Father said that when he would call the Defendant's wife to ask questions about the children she would generally hand the telephone to the Defendant. After this occurred "numerous" times, Father began calling for the Defendant directly. He said that, prior to learning about the incidents with his children, he and the Defendant's relationship was "fine." After learning about the Defendant's interactions with his children, Father sought to prevent his children from being around the Defendant. He confirmed that his children did not return to the Looney residence after spring break 2012.

Father testified about a supervised visit that was arranged with the Defendant's wife after he had learned of the Defendant's alleged physical abuse of J.H. and C.H.. According to the court order, the Defendant was not to be present during the visit. When Father arrived at the designated meeting area, both J.H. and C.H. said, "[The Defendant] is here." Father said both boys "seemed worried," "nervous" and "anxious." He recalled that A.H. was quiet and said nothing, although on the drive to the meeting area she had been talkative. Father said that he waited for fifteen minutes, believing that maybe the Defendant was merely dropping his wife off but, when the Defendant did not leave, Father drove away with the children. Father said that, at this time, he was unaware of any allegations involving A.H.

Father testified that, following the failed supervised visit, A.H. remained quiet and withdrawn for the next few days. He said that she also soiled herself at preschool one day, which was very uncharacteristic of her, and she did so again at home a couple of days later. Following this, Father and his wife spoke with A.H. because she "just wasn't acting right" and was not playing as she normally did. During this conversation, A.H. reluctantly told her parents about interactions with the Defendant. Father said that he was "very surprised" by A.H.'s disclosure. He said that A.H., as she spoke, became "shaky"

9

and appeared nervous. Father recalled that, after learning of J.H. and C.H.'s disclosure about interactions with the Defendant, he had asked A.H. if the Defendant had hit or kicked her, and A.H. had indicated that the Defendant had not. Father said that he never thought to ask A.H. about sexual abuse.

Father testified that he contacted DCS about the allegations of sexual abuse and agreed that he had contacted DCS before in regard to incidents involving inappropriate touching by A.H.'s maternal grandmother and the Defendant. Father said that the maternal grandmother had "reached in [A.H.]'s pants and wiped her down there in a hallway at church." He said this behavior was "odd" and made A.H. uncomfortable, so he made a complaint through DCS. As to the prior reported inappropriate contact with the Defendant, A.H. had disclosed that the Defendant "had laid her down up on the washing machine and was looking at her down there with a flashlight because she was complaining of burning down there."

Father testified that, after learning about the incidents with A.H., A.H. also began attending counseling sessions. After contacting DCS regarding A.H.'s allegations, Father contacted Mr. McCarter, who filed a temporary restraining order to prevent the children from having to be around the Defendant until the allegations could be resolved. Father stated that he had never discussed the allegations with the Defendant or his wife, rather he had "let the authorities handle it." A Department of Children's Services Employee, Kevin Smith, first came and met with A.H., and then he arranged for A.H. to speak with LaToya Nelson at the Child Advocacy Center. Next, Father took A.H. to Our Kids for a forensic evaluation. Father stated that he was not present for any of the conversations between these professionals and A.H. because he was always asked to wait in another room. He stated that he was present during the medical exam portion of the forensic evaluation at Our Kids "so [A.H.] wasn't scared." Father stated that A.H. was still routinely tested, as recommended by the Our Kids staff, for sexually transmitted diseases and "so far everything ha[d] been okay."

On cross-examination, Father agreed that it was in July 2011 when Mr. McCarter filed a petition to modify the parenting plan on his behalf. It was in this petition that the allegations of inappropriate touching by the maternal grandmother and the Defendant were raised. Father agreed that he had reported these allegations to the Department of Children's Services ("DCS"). Father agreed that, at the time of J.H.'s incident at school on March 26, 2012, the parties were in litigation regarding the parenting plan. Father denied telling his children to make false statements about the Defendant to their counselor.

Jennifer Hanket, a licensed clinical psychologist, testified that she initially met with Father and his wife ("Stepmother") on April 3, 2012, to begin working with their

10

children, J.H. and C.H., regarding an alleged incident of physical abuse by the Defendant. Dr. Hanket recalled that, during the intake session, Father also informed her of an incident at school involving J.H. being bullied by another student. Dr. Hanket said that, in situations like this one, she normally saw children separately rather than together in order to evaluate consistency in what the children are reporting. She said that, in doing so, she looked for the details of the alleged incident as provided by each child. She stated that she "always" assessed a child for "coaching" to determine whether there were indicators that someone else was motivating the child to tell an untruthful story. Dr. Hanket testified that, in speaking with C.H. and J.H., she did not identify any concerns about coaching.

Dr. Hanket testified that she began working with J.H. and C.H. in April 2012 and began meeting with A.H. on May 8, 2012, about other alleged incidents. Dr. Hanket confirmed that she was still treating all three children at the time of trial. About J.H., Dr. Hanket said that she first met with him on April 13, 2012. She described J.H. as being "shy," "rather quiet," and "well behaved" when she began meeting with him. Dr. Hanket said that J.H. would not maintain eye contact with her when he discussed his family and the alleged incident of physical abuse by the Defendant.

Latoya Nelson, a fifth-grade teacher at the time of trial, testified that she had previously worked for the Child Advocacy Center as a forensic interviewer in child sex abuse cases. Ms. Nelson said that DCS referred A.H. to the Child Advocacy Center for an interview and that she met with A.H. on April 30, 2012. Ms. Nelson said that Father accompanied A.H. to the interview but remained in the lobby area while she spoke with A.H.. She explained that there was a closed circuit "observation room" where law enforcement or DCS employees could watch an interview in progress. During A.H.'s interview DCS employee Kevin Smith was present in the observation room.

On cross-examination, Ms. Nelson stated that she had spoken with A.H. on a previous occasion, May 27, 2011. When asked if that interview was recorded, she responded, "All of our interviews are recorded."

The Defendant's wife testified that she was J.H., C.H., and A.H.'s mother. She stated that she had been married to the Defendant for "going on almost four years." She confirmed that she and the Defendant were the parents of three-year-old J.L. The Defendant's wife confirmed that she was involved in an accident in 2007 while still married to Father. As a result of this accident, she sustained two broken legs, two broken arms, and brain trauma. She stated that she was in a coma for several months following the accident.

11

The Defendant's wife testified that she learned about the incidents alleged in this case through Stepmother. She stated that she did not have a good relationship with Stepmother but that she believed that Stepmother took good care of J.H., C.H., and A.H.. According to the Defendant's wife, Stepmother called her residence, spoke with her initially, and then asked to speak with the Defendant. The Defendant's wife could not recall when Stepmother called the house but said it was "[q]uite a while" after the children had stayed with her during spring break.

The Defendant's wife testified that the Defendant drove her to the Sheriff's Department where they met with Detective McCallum in her office. The Defendant's wife said that she and the Defendant met with Detective McCallum on two different occasions. During the first meeting, they spoke with the detective about J.H. and C.H.. The Defendant's wife said they discussed an incident during which the Defendant "went back to the back bedroom." The Defendant's wife said that she was either in the living room or her bedroom at the time of the incident and could not see or hear what occurred in the back bedroom.

The Defendant's wife testified that the children would often sit in the Defendant's lap while sitting in the living room and that A.H. called the Defendant, "Daddy." The Defendant's wife explained that there were two beds in the bedroom she shared with the Defendant. She slept in one, and the Defendant slept in the other. When A.H. would stay with them, however, A.H. slept in the Defendant's bed, and the Defendant would sleep in the bed with the Defendant's wife. The Defendant's wife recalled an incident when J.H. and C.H. had gone to pick blackberries with the Defendant. When they returned, the Defendant took A.H. out to pick blackberries, not mushrooms, because she felt "left out." When asked if the Defendant returned with blackberries, she stated, "No. I don't know." The Defendant's wife said that, while the Defendant took A.H. to pick blackberries, she stayed home with the three boys. At some point she went out in the backyard and called out for the Defendant and A.H. but received no response. She said that the Defendant had taken A.H. to pick blackberries on their neighbor's property.

The Defendant's wife testified that she thought the second meeting with Detective McCallum was "like the next day." She said that she and the Defendant never spoke about the allegations or why they were going to the Sheriff's Department. During this second meeting, Detective McCallum told them about the allegations involving A.H.. The Defendant's wife said that the Defendant took with him a pair of shorts when they met with Detective McCallum the second time, but she was unaware of why he brought the shorts.

Outside the presence of the jury, the State played portions of the recorded interviews with Detective McCallum. The Defendant's wife confirmed that it was her

voice on the recording. The State resumed questioning the Defendant's wife about her statements to Detective McCallum. The Defendant's wife stated that she recalled telling Detective McCallum that she had some "concerns" or "suspicions" about A.H. and the Defendant. She said that her suspicions were based upon the fact that A.H. liked to sit on the Defendant's lap. When asked if the Defendant liked for A.H. to sit on his lap, the Defendant's wife said, "He didn't mind. All of the kids sat in his lap." Even though all of the children sat on the Defendant's lap, the Defendant's wife stated that she was only suspicious about A.H. "because she's my daughter." The Defendant's wife said that she spoke with the Defendant about her concerns but could not recall whether it was before or after the couple met with Detective McCallum.

The Defendant's wife testified that she did not recall the incident Father first reported to DCS about the Defendant's inappropriate contact with A.H.. She said that A.H. developed a rash on her inner thigh area and that the Defendant had applied ointment on the rash. The Defendant's wife said that she was present in the bathroom when the Defendant applied the ointment. As to the allegation against her mother, A.H.'s maternal grandmother, she explained that her mother was merely tucking A.H.'s shirt in at church.

The Defendant's wife identified a photograph of the bed that A.H. slept in when she stayed with them. The Defendant's wife agreed that A.H. also slept in a chair in the living room. The Defendant's wife remembered the failed visitation attempt where Father left because the Defendant was there. The Defendant's wife agreed that she was aware the Defendant was not to be present during the visitation pursuant to a court order, but she said that there was a reason the Defendant was with her that day although she could not recall the reason. The Defendant's wife agreed that she had told Detective McCallum that J.H. was "pretty honest," but she said that the incident where J.H. alleged that the Defendant held him by his neck did not happen. The Defendant's wife agreed that she had told Detective McCallum that she was asleep during this incident and that she did not know what had happened.

The Defendant's wife denied any memory of speaking privately with the Defendant while at the sheriff's department. She could not recall a discussion about "white stuff coming out of his private" or the Defendant telling her that he was asleep when that occurred. The Defendant's wife confirmed that, despite having listened to the audio recording of the discussion, she could not remember what she and the Defendant spoke about at the sheriff's department. She agreed that those statements were on the recording and true at the time she made the statements. The Defendant's wife said that she did not recall telling Detective McCallum that, after leaving the sheriff's department the first time, the Defendant had told her that A.H. had approached him while he was asleep and started "playing with it" and woke him up. The Defendant told the detectives

13

that he told A.H. to stop, and she put her lips on "it." The Defendant's wife maintained that she could not recall this information even though she had just listened to the video recording. The Defendant's wife did recall telling Detective McCallum that she thought there was more to the story than the Defendant disclosed to her. She agreed that she did not believe that A.H. went over to the Defendant and "pulled his penis out and put her lips on it."

The Defendant's wife testified that she told Detective McCallum that she kept trying to ask the Defendant about his interactions with A.H. but that he "really didn't want to talk to me about it." The Defendant's wife agreed that she had told Detective McCallum that she and the Defendant had not engaged in sex since J.L. was born. She told Detective McCallum that she "would try" but that the Defendant was disinterested.

The Defendant's wife testified that the Defendant would go out and hunt for mushrooms, ginseng, and blueberries. She recalled an incident when the Defendant took A.H. with him, and the Defendant's wife became worried. She said that the Defendant took A.H. to a neighbor's property that one could reach by walking from their residence or driving. The Defendant's wife confirmed that her residence was in Rutherford County.

On cross-examination, the Defendant's wife stated that she did not believe that the Defendant had done "this." On redirect examination, the Defendant's wife agreed that she told Detective McCallum that she believed "it." She further agreed that she and the Defendant had not had "a lot of contact" since the allegations had been raised and that she missed him.

Mickey McCullough, a Rutherford County Sheriff's Department sergeant, testified that he spoke with the Defendant on June 13 and June 14, 2012. Sergeant McCullough stated that his initial interactions with the Defendant and the Defendant's wife on June 13, 2012, were "helpful" in nature; for example, he showed them to the bathrooms and brought them water. He said that he told both the Defendant and his wife that they were "free to go. They don't have to be here." Sergeant McCullough confirmed that there was a video recording of the interviews.

Sergeant McCullough testified that he observed a conversation between Detective McCallum and the Defendant and a conversation between the Defendant and his wife before he entered the interview room. He said that Detective McCallum asked him to come into the interview room to "be a little more direct with the Defendant" because the Defendant had been telling Detective McCallum "partial truths" and "out and out lies." Sergeant McCullough recalled that the Defendant was very comfortable speaking with Detective McCallum and his wife. The Defendant even complimented Detective

14

McCallum on how she was conducting the interview. The Defendant's demeanor changed, however, when Sergeant McCullough spoke with him. He said that the Defendant became "more guarded" and gave "partial admissions" about what had occurred, which were inconsistent with his statements to Detective McCallum. Sergeant McCullough said that, approximately fifteen minutes after he began speaking with the Defendant, the Defendant remembered an event. Sergeant McCullough said that often a perpetrator is hesitant to disclose his conduct to a female, especially when the victim is a female. Thus, Sergeant McCullough was not surprised when the Defendant had denied any recollection with Detective McCallum but shortly thereafter recalled an incident when speaking with him.

Sergeant McCullough testified that the Defendant went home after the June 13 interview and, as he left, apologized to Detective McCallum "for lying." On the following day, the Defendant told Sergeant McCullough that "it's possible" that while he was sleeping, A.H. pulled his penis out of his shorts or his penis "flopped out" of his pants, "[a]nd he woke up and he saw her mouth on his penis." The Defendant said he responded to A.H. by pushing her away and telling her, "no." The Defendant brought three pairs of shorts on June 14, 2012, that he may have been wearing during the incident. Sergeant McCullough measured the inseam of the shorts, six and a half inches, and the length of the Defendant's penis, "a little less than two inches." The shorts the Defendant brought had elastic waists with no zippers or opening in the front. The Defendant stated that he did not wear underwear. Sergeant McCullough explained that he measured the inseam of the shorts and the Defendant's penis because the Defendant had multiple explanations of how the incident had occurred.

Sergeant McCullough reiterated that the Defendant was free to leave at any time during either interview and that he conveyed this to the Defendant multiple times.

On cross-examination, Sergeant McCullough agreed that, on June 13, 2012, he did not have probable cause to arrest the Defendant. Sergeant McCullough testified that he was unaware that the Defendant had a seventh-grade education and that the Defendant had had a stroke.

Kevin Smith, a DCS Child Protective Services investigator, testified that he was assigned the complaints involving J.H., C.H., and A.H.. Mr. Smith said that his involvement began in February 2012, with an initial referral alleging physical abuse involving Father. That investigation was unsubstantiated. While that case was still ongoing, Mr. Smith received information about an incident with J.H. at school that occurred on March 26, 2012. Mr. Smith referred J.H. to Youth Villages for an assessment and spoke with school personnel. Mr. Smith first met with J.H. in April at his school. Based upon his conversation with J.H., he went to Father's residence several

days later to speak with C.H.. Mr. Smith said that both of the children were comfortable talking with him because they recognized him from the previous complaint he had investigated.

Mr. Smith testified that, after speaking with J.H. and C.H., he had concerns about domestic violence issues with the Defendant. He learned that an order of protection was in place at the time, so he went to the Looney residence to meet with the Defendant and his wife. The Defendant told Mr. Smith that he was a good role model for the children and that they looked up to him. The Defendant said that he and his wife had formerly used spanking as a form of disciplinary intervention but no longer did so. He told Mr. Smith that the only time that he had ever "put his hands on any of the children" was on an occasion when J.H. had wanted to "run off." The Defendant said that he "gently put his hand" on J.H.'s shoulder to restrain him. As to the incident that J.H. alleged the Defendant grabbed him by his neck, the Defendant said that he only went in the boys' room to turn off the television.

Mr. Smith testified that there were two things that struck him during this visit to the Looney residence. First, J.H. and C.H.'s description of the residence was detailed and accurate. Second, the Defendant made a point to tell Mr. Smith that he did not have full use of his left arm, due to a stroke, and could not even pick up a gallon jug of water with the left arm. Later, Mr. Smith observed the Defendant pick up J.L. with his left arm. Mr. Smith said that he closed the physical abuse complaint toward the end of April with the classification "substantiated for physical abuse."

Mr. Smith testified that, within ten days of closing the physical abuse complaint involving J.H. and C.H., DCS received another referral involving the sexual abuse of A.H.. Mr. Smith was also assigned this complaint. Mr. Smith said that he had spoken to A.H. before regarding a 2011 allegation of inappropriate touching by A.H.'s maternal grandmother that was classified "unsubstantiated." Mr. Smith said that there was no complaint against the Defendant at that time. The only referral involving the Defendant was the sexual abuse allegation received on April 30, 2012.

Mr. Smith testified that he observed the forensic interview of A.H. at the Child Advocacy Center on a closed circuit monitor from an adjacent room. Mr. Smith said that he observed A.H. sitting "very comfortably," and the interviewer "building rapport." The interview lasted a little more than thirty minutes and then A.H. was returned to her parents. After the interview, Mr. Smith encouraged Father to take A.H. to Our Kids in Nashville for evaluation. He also referred the family to Dr. Hanket for counseling. Mr. Smith said that, toward the end of May, he and Detective McCallum determined that they needed to speak with A.H. again. This time the interview was held in a conference room at the Department of Children's Services. In this interview, Mr. Smith "for lack of a

better word challenge[d]" some of A.H.'s disclosure and A.H. "insist[ed]" that "these things happened." Based upon his investigation, Mr. Smith had no concerns about A.H. remaining in Father's custody. This referral was substantiated and the multidisciplinary team agreed "to indicate [the Defendant] for sex abuse."

After hearing this evidence, the jury convicted the Defendant of four counts of rape of a child, one count of felony child abuse, and one count of misdemeanor child abuse. After a subsequent sentencing hearing, the trial court sentenced the Defendant to serve an effective sentence of fifty years in prison.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it: (1) denied his motions for mistrial; (2) denied his motion to suppress his pretrial statements; (3) refused to grant a new trial based upon the State's failure to provide a recorded statement by the victim; (4) admitted inadmissible testimony from an expert witness; (5) allowed a witness to refresh her memory by viewing a video recording; (6) determined that the evidence against him is sufficient to sustain his convictions; (7) failed to grant a mistrial in light of a juror's failure to disclose exposure to pretrial publicity; and (8) ordered consecutive sentencing. We now address each of the Defendant's issues in turn.

### A. Juror Misconduct

The Defendant asserts that he was denied the right to an impartial jury based upon three instances of juror misconduct: (1) two jurors' interaction with the court officer about the possibility of A.H. testifying outside the Defendant's presence; (2) the foreperson's interaction with Detective McCallum outside of court; and (3) a newspaper with an article about the trial found in the jury room. He contends that extraneous prejudicial information and improper outside influence altered the jury's verdict. The State responds that the trial court correctly found no "manifest necessity" for a mistrial.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. *See Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A mistrial is appropriate "when the trial cannot continue, or, if the trial does continue, a miscarriage of justice will occur." *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Arnold*, 563 S.W.2d at 794. One description of manifest necessity is that, "[i]f it appears that some matter has occurred which would prevent an impartial verdict from being reached," a

17

mistrial must be declared. *Id.* Additionally, a manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. Crim. App. 1981). The burden of establishing a manifest necessity lies with the defendant. *State v. Seay*, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996).

Every criminal defendant has a constitutional right to a trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see also State v. Sexton*, 368 S.W.3d 371, 390 (Tenn. 2012). Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge. *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990). When a jury has been subjected to either extraneous prejudicial information or an improper outside influence, the validity of the verdict is questionable. *See State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984). Extraneous prejudicial information has been broadly defined as information "coming from without." *State v. Coker*, 746 S.W.2d 167, 171 (Tenn. 1987) (internal quotation marks omitted). More specifically, extraneous prejudicial information is information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case. *Robinson v. Polk*, 438 F.3d 350, 363 (4th Cir. 2006); *Blackwell*, 664 S.W.2d at 688-89. An improper outside influence is any unauthorized "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." *Remmer v. United States*, 347 U.S. 227, 229 (1954); *see also Blackwell*, 664 S.W.2d at 689.

A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence. *Caldararo*, 794 S.W.2d at 740-41. Once the challenging party has made the initial showing that the jury was exposed to extraneous prejudicial information or an improper outside influence, a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless. *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005) (citing *Blackwell*, 664 S.W.2d at 689; *State v. Parchman*, 973 S.W.2d 607, 612 (Tenn. Crim. App. 1997)).

### 1. Juror Bias in Favor of State's Witness

On the fifth day of trial, the defense stated that it had learned while on the elevator coming up to the courtroom that two jurors, Juror Davis and Juror Cunningham, had approached the court officer, Marshal Oberkirsch, and asked if the Defendant could be removed from the courtroom while A.H. testified. The trial court acknowledged its awareness that the interaction had occurred and stated that it had instructed Marshal Oberkirsch "simply to tell them he could not respond or talk to them about the case."

The trial court then questioned Juror Davis about her interaction with Marshal Oberkirsch. Juror Davis confirmed that she inquired whether A.H. could testify without the Defendant present. She confirmed that Juror Cunningham was with her when she made this inquiry. About the exchange, Juror Davis stated:

> I wanted to ask the Marshal or however you say that.
>
> . . . .
>
> Before we went to lunch. Because it was just bothering me. And I did mention it to her, to [Juror Cunningham], that I was like I just got the feeling that [A.H.] was uncomfortable testifying with him in the room.
>
> Because at a certain point, [A.H.] was doing good. And then in my opinion, she made eye contact with him. And it was like she just got really uncomfortable.

Juror Davis confirmed that she mentioned her observation to Juror Cunningham before the two jurors approached the court officer, but that their discussion was limited to her observation that A.H. looked "uncomfortable." Juror Davis said that she said to Juror Cunningham, "I would like to find [Marshal Oberkirsch] and ask him if that would even be a possibility at all before we go to lunch." Juror Davis said the court officer said that he would "let somebody know," and then after lunch he told her that he "took it to them" and that he could not discuss it any further with her. Juror Davis reiterated that she told Juror Cunningham that A.H. "looked uncomfortable" but denied discussing the evidence or the guilt or innocence of the Defendant. Juror Davis maintained that she could still honor her role as a juror. She stated:

> In my opinion, [the Defendant's] life is changed regardless of the outcome. And I want to make sure that if he's innocent that it's over for him. Because regardless of the outcome, his life is changed forever.

Juror Davis confirmed that she was still willing to listen to all of the evidence before making a decision in this case.

Juror Cunningham confirmed that she and Juror Davis approached Marshal Oberkirsch in the hallway to inquire whether the victim could testify outside the presence of the Defendant. He told the jurors that he would speak with the judge about it. When the two jurors returned from lunch, Marshal Oberkirsch told the two jurors that he had "addressed it," and "he couldn't do anything about it." Juror Cunningham said that she

had not made any decision regarding the Defendant's guilt or innocence yet and that there was still evidence to evaluate.

The trial court denied the Defendant's request for a mistrial stating:

I agree that it's not a positive situation that we had these two jurors approach Marshal Oberkirsch.

The authorities regarding a mistrial provide that a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. That is the *State vs. Saylor* case out of the Tennessee Supreme Court.

There is also language stating that the purpose of a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict. That's *State versus Williams* out of the Court of Criminal Appeals. And the burden of establishing the necessity for a mistrial lies with the party seeking it.

I don't think that we have reached that level here. I don't think that based on what we heard from the two jurors in question that we are at a point in this trial where a miscarriage of justice would result if the trial continued.

I don't think there has been irreparable damage done to the judicial process based on the actions of these two jurors, which would preclude an impartial verdict.

You know, I questioned - - well, we questioned them about what happened. And they both, I think, were candid about it. I think they both indicated that they would be able to continue unbiased and to render their verdict based only on the evidence.

And, in fact, one of the jurors went out of her way to explain that, you know, she thinks whether a Defendant under these circumstances is wrongly accused or guilty, whatever the case may be that it's something that would change somebody's life forever either way. So, you know, that unsolicited statement indicated to the Court that she is taking her responsibilities very seriously in this case. And has not decided one way or the other what her verdict is going to be.

20

And while the other juror, Ms. Cunningham, didn't come forward with as strong of a statement as that, I don't think there is anything in her testimony or her statement regarding the incident last week that showed that she cannot reach an impartial verdict.

So, I find that the burden has not been met by the Defense requesting a mistrial here. I don't think we have reached that level of a miscarriage of justice. So, I will respectfully deny the motion.

We conclude that the Defendant has failed to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence. Juror Davis and Juror Cunningham approached Marshal Oberkirsch and inquired about the possibility of A.H. testifying outside the Defendant's presence because A.H. appeared uncomfortable. The jurors were entitled to consider A.H.'s demeanor while testifying. Their observations of her demeanor do not constitute outside information in the form of fact or opinion not entered in evidence or "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." *Remmer,* 347 U.S. at 229. Information that can be inferred from the evidence offered at trial is not extraneous. *See State v. Crenshaw*, 64 S.W.3d 374 (Tenn. Crim. App. 2011).

The Defendant, in his brief, alleges that this interaction between the jurors occurred on Friday, December 6, 2013, and that his attorneys did not learn of the interaction until they were on their way into the courtroom on the morning of Monday, December 9, 2013. There is little in the record about the specific timeline of these events, but the Defendant's brief states, "However, it was clear from the trial court's recitation of what occurred that the trial court was aware of the issue at or near the time it happened." He makes no further argument in this regard; however, to the extent this one sentence in the Defendant's brief raises an issue about the trial court's knowledge of the juror interaction and the delay in disclosing it to defense counsel, we conclude that the Defendant has failed to show that he was prejudiced by any delay in disclosure by the trial court and is not entitled to relief as to this issue. We note, however, that it would be better practice for a trial court to disclose any unauthorized communications to both parties at the time the court first learns of such communication.

### 2. Juror Interaction with Detective McCallum Outside of Court

The defense also raised, on the fifth day of trial, concern that Juror Festervand, who later became the foreperson, had spent time with, the prosecuting witness, Detective McCallum outside of court during the trial. The trial court questioned both Detective McCallum and the juror individually about their out-of-court interaction. Detective

McCallum testified that, while on the way to court one morning during the previous week, she had observed a traffic accident and stopped to render aid. About this incident, she stated:

> I pulled up just as [the accident] happened. And [the juror] was out of his vehicle. There was a woman and a man entrapped in a vehicle. So, I immediately went to that vehicle. In fact, I didn't even notice who [Juror Festervand] was. I was so focused - - because there was a child in the car as well.
>
> Soon after that, I took the child in my arms because a passerby had taken her. And he looked at me and said - - the juror said, I'm in your trial. I'm going to be late. I said, don't worry. I went to my vehicle and called dispatch. And that was pretty much the extent of our discussion.

Detective McCallum confirmed that there was no discussion of the case. She stated that she did not recognize the juror and she merely assured him she would notify the court of the delay. She explained that the accident had just occurred and the vehicles involved were in the middle of the road. Department protocol required that she stop, engage her emergency lights, and render aid. She said that, once a Murfreesboro Police Department officer arrived, she provided him with the parties' identification and then proceeded on to court.

Juror Festervand testified about his interaction with Detective McCallum at the scene of the accident as follows:

> It was really pretty quick. When I hit the car, obviously, I was pretty shook up. I got out and saw that there was a white unmarked car with their lights on.
>
> As soon as [Detective McCallum] stepped out, I recognized her. She bypassed me and went straight to the car that got hit and helped the child out. Took the child to the fire truck. Asked me if I was okay. I said, yes. I'm just concerned about court.
>
> And then she said, well, I'll call in and call the station. And then, honestly, I turned around and she was gone. I never really saw her leave. She just told me that she was going to call in and check and make sure that you guys knew that I was going to be late.

Juror Festervand denied that either of them spoke about the case. He said that he and Detective McCallum were both more concerned with the car he had hit. He confirmed that his interaction with Detective McCallum would in no way affect his ability to remain unbiased about the case.

The trial court denied the Defendant's motion for mistrial finding:

I think the mere encounter between the detective at a traffic stop and Mr. Festervand, I don't think the mere encounter disqualifies the juror. He seemed very sincere and credible to me in the fact that it would not influence his thinking either way. . . .

And I don't really find anything in the traffic stop changes anything about his ability to serve as an unbiased juror.

In this instance, we conclude that the Defendant has failed to make an initial showing that Juror Festervand was exposed to extraneous prejudicial information or subjected to an improper outside influence. The detective and the juror's limited discussion about notifying the trial court of the juror's delay due to a traffic accident does not bear on a fact at issue in the case. Detective McCallum, following sheriff's department protocol, stopped to render aid in an accident blocking a lane of traffic. Juror Festervand, who was involved in the accident, identified himself to Detective McCallum for the purpose of expressing concern that he would be late to the trial. Detective McCallum responded that she would notify the court. This contact was unforeseen and completely unrelated to the Defendant's charges. Accordingly, the Defendant is not entitled to relief as to this issue.

### 3. Newspaper in the Jury Room

The Defendant asserts that the trial court erred when it denied his request for a mistrial after a newspaper containing an article about the Defendant's trial was found in the jury room. As part of this issue, the Defendant raises for the first time on appeal that the photograph in the newspaper article is a "mug-shot" that is prejudicial to the Defendant. The State contends that the Defendant has waived any issue raised for the first time on appeal. It further contends that the trial court did not err when it denied the mistrial based on the newspaper found in the court room.

The newspaper, which contained a photograph of the Defendant, is contained in the record. As the State notes, the photograph is a small head shot of the Defendant standing in front of, what appears to be, a light gray wall. The picture is small with no

23

indicia, such as a mug-shot placard or identification, that the photograph is a mug-shot. Nonetheless, we may not review an issue raised for the first time on appeal; therefore, to the extent the Defendant complains about the photograph being a mugshot, the issue is waived because it was not raised in the motion for new trial. *See* Tenn. R. App. P. 3(e). Thus, we review the Defendant's issue only in the context that the trial court erred when it denied his request for a mistrial based upon the presence of the newspaper in the jury room.

On the fourth day of trial, the trial court notified the parties that his judicial assistant had found a local newspaper in the jury room after court had adjourned on the previous day. The local newspaper contained an article about the trial. The Defendant requested a mistrial based upon the presence of the newspaper in the jury room. The State responded that the article was a "brief synopsis" of what had occurred in trial and nothing the jury had not already heard during the trial. Noting the Defendant's position on the issue, the trial court elected to poll the jurors individually about the newspaper found in the jury room.

Jurors 1 and 2 indicated that they had not read the newspaper and did not know who had brought the newspaper into the jury room. Juror 2 stated that he had observed one juror reading the classified section of the newspaper. Juror 3 stated that he was unaware of who brought the newspaper into the jury room but that he had looked at the crossword puzzle in the newspaper. He said that he also noticed that "[t]here was something about the trial" but that he "threw [the newspaper] down" when he saw the headline. Juror 3 stated that the fact that there was media coverage of the case had no influence on him regarding the Defendant's guilt or innocence. Juror 3 indicated that he had observed Juror 8 reading the newspaper as well.

Juror 4 stated that he was unaware of who had brought the newspaper into the jury room but, once he saw the Defendant's photograph in the paper, he "threw the paper away." Juror 4 said that the media coverage of the case in no way affected his ability to render a fair verdict based only on the evidence. Juror 5 stated that he was unaware of the owner of the newspaper but that he had read the classified section of the paper. He said that he was unaware that there had been an article about the Defendant's trial in the newspaper and that he did not recall seeing any other juror reading the newspaper. Juror 6 identified a female juror, Juror 8, as the owner of the newspaper. He denied reading any portion of the newspaper but said that he observed Juror 8 reading it.

Juror 7 stated that she was unaware that a newspaper had been in the jury room the previous day. Juror 8 admitted that she brought the newspaper into the jury room. She stated that she had read a portion of the article about the trial but that it had not influenced her as to the Defendant's guilt or innocence. She described the portion of the

24

article she had read as nothing "more than what [she] had already seen in the courtroom." Juror 8 said that when she realized the article was about the trial she stated, "oh, my gosh, we are in the newspaper," and other jurors said, "you had better [not] read that." She said that she then folded up the newspaper and did not read the remainder of the article. She said this occurred "fairly early before everybody" had arrived. She estimated that "maybe" five or six other jurors were in the room when she made the statement about the newspaper. Juror 8 stated that she did not think any of the other jurors read the article. Juror 8 said that there was another juror that had indicated that the juror had heard about the case in the media "last year."

Juror 9 stated that she was unaware of who had brought the newspaper into the jury room and that she had not read any part of the newspaper. She had, however, observed a male juror reading the section of the paper that listed available properties for sale. Juror 10 stated that he did not know who brought the newspaper into the jury room, that he had not read it, and that he was not present for any discussion among the jurors about the newspaper. Juror 11 was unaware of who the owner of the newspaper was and stated that he did not read any portion of it; however, he did observe Juror 3 reading the paper.

Juror 12 stated that he observed the owner of the newspaper reading it, and he advised her that she should not be reading the newspaper. He did not see anyone else reading the newspaper. Juror 13 did not know whose newspaper was in the jury room but she observed "a few" jurors reading the newspaper. She denied reading any portion of the newspaper. She further denied any discussion among the jurors about the newspaper. Juror 14 stated that he did not read the newspaper nor did he see any other juror reading the newspaper. All of the jurors individually confirmed that they could render a fair verdict in the case.

Following the questioning of all the jurors, the trial court decided to excuse Juror 8 who admitted ownership of the newspaper and to having read a portion of the article. About the decision to deny the Defendant's request for a mistrial, the trial court stated:

> I think the mere fact that jurors are aware that the media is covering a case, I think that fact alone does not require a mistrial when the jurors testify that they can base their decision solely on what they hear in this courtroom.
>
> And I found that all of the jurors that we questioned indicated they could do that. And they all appeared to be credible and honest to me about that. I didn't notice anything in their body language or demeanor to suggest that they were not being truthful when I asked them that.

The Defendant has not carried his burden of showing a manifest necessity for a mistrial. The trial court thoroughly polled each juror and gave both parties the opportunity to question the jurors. Each juror indicated that the fact there was media coverage in this case would not affect their ability to serve as an impartial juror. The trial court found each of the jurors credible in their statements regarding their ability to render a fair verdict. After hearing from all the jurors, the trial court excused the owner of the newspaper, who was also the only juror who read a portion of the article. Our review of the article is consistent with Juror 8's statement that the information was nothing more than what was presented at trial. We conclude that the trial court did not abuse its discretion when it denied the Defendant's motion for a mistrial.

### B. Motion to Suppress Pretrial Statement

The Defendant asserts that the trial court erred when it denied his motion to suppress his pretrial statements to police because he was not advised of the *Miranda* rights. The State responds that *Miranda* applies during custodial interrogations and that the Defendant was not in custody at the time he provided the statements; therefore, the trial court properly denied the Defendant's motion to suppress.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

*Miranda v. Arizona* bars the admission of any statements elicited from a defendant through police initiated custodial interrogation unless the defendant, prior to making the statement, was warned of certain constitutional rights and knowingly waived those rights. 384 U.S. 436, 444, (1966). These procedural safeguards require that police officers must advise a defendant of his or her right to remain silent and of his or her right to counsel

26

before they may initiate custodial interrogation. *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005). If these warnings are not given, statements elicited from the individual may not be admitted into evidence. *Id*. If the suspect indicates in any manner that he wishes to remain silent, custodial interrogation must cease. *State v. Huskey*, 177 S.W.3d 868, 877 (Tenn. Crim. App. 2005).

In *Miranda*, "custodial interrogation" was defined by the Court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 530 U.S. at 444. A person is "in custody" within the meaning of *Miranda* if there has been "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal citations omitted); *accord Yarbrough v. Alvarado*, 541 U.S. 652, 653 (2004). *Miranda* has been held not to apply "outside the context of inherently coercive custodial interrogations for which it was designed." *Roberts v. United States*, 445 U.S. 552 (1980).

The Tennessee Supreme Court has identified several factors used to determine whether the police subjected a suspect to "custodial interrogation:"

> Some factors relevant to that objective assessment include the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996).

At the suppression hearing, Detective McCallum testified that she conducted three interviews with the Defendant. She explained that initially she was assigned a child abuse case involving only J.H. and C.H.. She said she was assigned the case several days after J.H. had attempted to strangle himself at school, in March 2012, after J.H. stayed at the Looney residence for spring break. Detective McCallum contacted the Defendant, who had been identified as a suspect, by telephone at the beginning of May, and he

agreed to meet with her at the sheriff's department. During this interview, the conversation centered on the J.H. and C.H. with no discussion of A.H..

Detective McCallum testified that the May interview lasted approximately thirty minutes. She spoke with the Defendant's wife an additional thirty minutes after speaking with the Defendant. The Defendant drove himself to the sheriff's department, and Detective McCallum informed him when he arrived that there were no warrants against him. She thanked him for meeting with her, and he responded that "he just wanted to get this resolved." Once they sat down, she inquired whether he preferred the door open or closed, he said he did not care, and she told him she would close the door for "privacy purposes."

Detective McCallum testified that, at the end of April, Father reported allegations of sexual abuse by the Defendant involving A.H.. This case was also assigned to Detective McCallum, and she left the Defendant a message on June 12, asking if he would meet with her again. The Defendant agreed to go to the sheriff's department on June 13 to speak with Detective McCallum. He drove to the office with his wife and their son, J.L. Detective McCallum said that she once again thanked the Defendant for coming and he responded that he "wanted to get this resolved." She denied making any coercive or intimidating statements to the Defendant. Detective McCallum said that no restraints were used during the meetings and that the Defendant was not in custody during either interview.

Detective McCallum testified that during the June 13 interview she spoke with both the Defendant and the Defendant's wife privately, and that she also allowed the Defendant and his wife to talk without her in the room. She stated that this time the Defendant was at the sheriff's department between two and a half and three hours. At times during this meeting, the Defendant was alone in the lobby or alone in the interview room. Toward the end of this meeting, Detective McCallum asked her supervising sergeant to speak with the Defendant. She explained that she thought the Defendant might be more comfortable talking about the sexual abuse allegations with a man. Detective McCallum recalled that, when Sergeant McCullough entered the room, he introduced himself to the Defendant and told him that there were no warrants or indictments against him and that the Defendant was free to leave at any time. She said that Sergeant McCullough then asked the Defendant about what had occurred with A.H..

Detective McCallum testified that the Defendant told Sergeant McCullough that he was asleep and woke up to find A.H. with his penis in her mouth. The Defendant described a pair of shorts he was wearing at the time that allowed for his penis to "flop" out the side of the shorts. Sergeant McCullough asked the Defendant how A.H. would know how to perform oral sex on a man, and the Defendant stated that he did not know.

Sergeant McCullough asked the Defendant about his "relations" with his wife, and the Defendant stated it had been more than a year since he had had "sexual relations" with his wife.

Detective McCallum testified that, after the Defendant had left the June 13 meeting, she spoke with Sergeant McCullough, and he suggested she ask the Defendant if he would be willing to bring to the sheriff's department the shorts he was wearing during the incident. The Defendant agreed to do so and came in the following day, June 14. For the previous meetings, Detective McCallum had offered time frames for her availability, but, on this final occasion, the Defendant picked the day and time. The Defendant once again drove himself to the sheriff's department accompanied by his wife. Sergeant McCullough was present again and informed the Defendant there were no warrants or indictments against him, and he was free to leave at any time. Detective McCallum confirmed that she never read the Defendant *Miranda* rights because he was present on his own free will and free to leave each of the meetings. She said the Defendant did not display any fear of arrest, and as he left the June 14 interview, he stated that he wanted "this resolved."

On cross-examination, Detective McCallum testified that one cannot enter the Detective Division of the sheriff's department where she interviewed the Defendant without a code or a "card" but that anyone can exit the area. Detective McCallum confirmed that she was in plain clothing and not carrying a weapon at the time of the interviews. Detective McCallum confirmed that she was aware the Defendant had difficulty hearing out of his left ear. She said that she did not recall that the Defendant had a seventh grade education. Detective McCallum testified that she did not routinely issue *Miranda* rights if she knew that a suspect was "leaving."

Sergeant McCullough testified that he was not involved with the May interview of the Defendant but, at Detective McCallum's request, participated in the June 13 interview. Sergeant McCullough explained that he was Detective McCallum's direct supervisor. Sergeant McCullough initially viewed the ongoing interview from another room. Based upon his observations of the Defendant's responses, demeanor, and body language, Sergeant McCullough believed the Defendant was being untruthful when speaking with Detective McCallum. Sergeant McCullough confirmed that the Defendant was not read *Miranda* rights. He explained:

> He was free to go at any time. He was informed that he was free to go at any time. That he was not under arrest. That there were no Grand Jury indictments. That no matter what he and she talked about, that he would be free to leave.

Sergeant McCullough testified that at no time during the June 13 interview did he think that the Defendant should be taken into custody. He explained that he did not consider an arrest because he did not think there was probable cause to arrest the Defendant.

Sergeant McCullough testified that, during the June 13 interview when he spoke with the Defendant, the Defendant stated that he was asleep in the recliner when he woke up and A.H. was "sucking his penis." The Defendant said he immediately pushed A.H. away while telling her to stop. Sergeant McCullough stated that he did not believe that this statement, alone, constituted probable cause. He explained that he had worked with children who "acted out on other people" based upon prior instances of molestation by other individuals. At this point, he believed the sheriff's department needed to conduct further investigation. Based upon the Defendant's initial statement, Sergeant McCullough did not believe that there was proof of intent or sexual gratification as required by statute.

Sergeant McCullough testified that the Defendant willingly returned to the sheriff's department on the following day, June 14, 2012. During this interview, Sergeant McCullough wanted to "follow up" on the Defendant's statements about the shorts he wore at the time of the incident. Sergeant McCullough stated that, even after the June 14 interview, he felt that Detective McCallum should continue to gather information about the incident before determining whether to file charges. Sergeant McCullough described the Defendant as cooperative and recalled that the Defendant kept saying he wanted to "get this resolved." Sergeant McCullough confirmed that the Defendant was told "multiple times" during both the June 13 and June 14 interviews that he was "free to leave."

On cross-examination, Sergeant McCullough testified that he did not issue *Miranda* rights on June 13 or June 14 because the Defendant was not in custody and free to leave.

The trial court later issued a written order denying the Defendant's motion to suppress, finding as follows:

> An examination of the *Anderson* factors demonstrates that a reasonable person in the [D]efendant's position would not have considered himself deprived of freedom of movement to a degree associated with a formal arrest. Although the interviews occurred at the Sheriff's Department, they were all scheduled at the [D]efendant's convenience. The duration of the questioning was rather lengthy (approximately five hours and twenty-five minutes, total for all three interviews), but this was broken up over three days; moreover, most of the questioning was done by

McCallum, whose questions were of a conversational (even friendly, at times) character. Both detectives maintained a polite demeanor and did not raise their voices; while McCullough was more firm and direct than McCallum, he never became threatening or coercive. McCallum and McCullough were the only detectives involved with the questioning, and they were only in the interview room together for a total of approximately one hour and twenty-three minutes. There was no restraint or limitation of movement imposed on the [D]efendant, aside from the closed, unlocked door of the interview room; although McCallum appeared to place her seat partially between the [D]efendant and the door during McCullough's participation in the interviews, this factor is not dispositive, particularly since the [D]efendant was left alone in the interview room and the lobby at other times. Likewise, although the [D]efendant was directly confronted with the detectives' suspicions and evidence of his guilt, this factor is overridden by the combined weight of the other factors, particularly the overall tone and demeanor of the detectives, their repeated statements to the [D]efendant indicating that he was not under arrest, and the [D]efendant's use of his own vehicle to travel to and from each interview at his convenience. On balance, the totality of the circumstances shows that the defendant was not in custody for purposes of *Miranda*. *See Anderson* at 855.

The closest situation to a custodial incident in this case occurred during the third interview, when McCullough instructed the [D]efendant to remove his jeans, change into his shorts, then drop his shorts and submit to measurement of his penis. While the Court was troubled by the invasive personal nature of that incident, one cannot overlook the fact that it occurred merely one minute and thirty-seven seconds after McCullough told the [D]efendant, "You're not under arrest. . . we don't have any arrest warrants for you, no grand jury indictments for you. . .I appreciate you cooperating. . . you're free to leave whenever you want to leave." Moreover, only the day before, the second interview had concluded with McCullough telling the [D]efendant, "I want you to consider coming back and talking to Detective McCallum and telling her what you know." The phrase "consider coming back" necessarily implied a freedom of choice and movement by the [D]efendant that would not be consistent with a formal arrest. Furthermore, the [D]efendant scheduled the third interview at a convenient time for himself, just as he had the first two interviews. He drove to the third interview in his own vehicle, just as he had for the first two interviews. Against this backdrop, a reasonable person would not have

31

considered himself deprived of freedom of movement to a degree associated with a formal arrest.

The evidence does not preponderate against the trial court's findings of fact. The purpose of the detectives' questioning was investigative, not interrogative, in nature. They were attempting to investigate J.H. and C.H.'s allegations of physical abuse and A.H.'s allegations of sexual contact. The detectives did not proceed in a lengthy round of questioning in a hostile setting. Instead, they broke the questioning up into three separate interviews set at the Defendant's convenience. The Defendant was asked to come and thanked for his participation in the investigation. The detectives did not force the Defendant to answer their questions, and the Defendant was told numerous times that he was free to leave. The detectives did not restrain the Defendant's freedom of movement during any of the interviews. They did not lay their hands on the Defendant, and they did not tell the Defendant that they would not allow him to leave. Viewing this matter under the totality of the circumstances, we conclude that a reasonable person in the Defendant's position would not have considered himself deprived of freedom of movement to a degree associated with a formal arrest.

For the reasons stated above, we conclude that the Defendant's pre-trial statements were properly admitted, and that the Defendant is not entitled to relief on this issue.

### C. State's Failure to Provide the Victim's Recorded Statement

The Defendant argues that he should have been granted a new trial because the State violated the rules announced in *Jencks v. United States*, 353 U.S. 657, (1957), and *Brady v. Maryland*, 373 U.S. 83, (1963), which pertain to witness statements and exculpatory evidence, respectively. The Defendant contends that after repeated requests for all statements of A.H., the State failed to provide the Defendant with a video-recorded statement of the victim, rendering him unable to adequately cross-examine the State's witness without the recording. The State responds that the Defendant has not shown that the recording in question even exists.

The Defendant speculates that this recording was made in regard to allegations of abuse against the Defendant and A.H.'s maternal grandmother. The only evidence of this alleged recording is the following exchange, which occurred between defense counsel and Ms. Nelson at trial:

Ms. Nelson:          . . . My report states that I spoke with [A.H.] on April the 30th of 2012.

32

| | |
|---|---|
| Defense: | Was that the only time you talked to her? |
| Ms. Nelson: | I talked to her another time before. And that was on 5-27-2011. |
| Defense: | And you don't know if any - - I'm sorry, strike that. One second. You said that last date that you said was May 27th of what year? |
| Ms. Nelson: | 2011. |
| Defense: | Was that for a video recorded interview also? |
| Ms. Nelson: | All of our interviews are recorded. |

The State's failure to disclose this statement, the Defendant contends, is a violation of Tennessee Rule of Criminal Procedure 26.2.

Rule 26.2 of the Tennessee Rules of Criminal Procedure, also known as Tennessee's version of the Jencks Act, states in pertinent part:

> (a) Motion for Production. After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Tenn. R. Crim. P. 26.2(a). Pursuant to Rule 26.2, the State has no duty to provide a defendant with a copy of a witness's statement until after the witness has testified on direct examination. *State v. Caughron*, 855 S.W.2d 526, 535 (Tenn. 1993) (citing *State v. Taylor*, 771 S.W.2d 387, 394 (Tenn. 1989)).

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To prove a *Brady* violation, a defendant must demonstrate that: (1) he requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not); (2) that the State suppressed the information;

33

(3) that the information was favorable to the defendant; and (4) that the information was material. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The Defendant's discovery request is not included in the record; however, a June 20, 2013 Motion to Compel Witness's Video Recorded Statement is included. The motion was denied but requested the State "produce the video recorded statement of [A.H.]." Based upon the trial transcript,[6] the Defendant did not request any *Jencks* materials during trial after the direct testimony of the State's witnesses. At the motion for new trial hearing, the Defendant argued that the May 2011 recorded statement of A.H. was not provided to him in discovery.

First, we note that the Defendant makes a general assertion that he is entitled to witness statements; however, beyond making that assertion, no other discussion of the existence of those statements, what information those statements contain, or their materiality to the Defendant's case is addressed in the Defendant's brief. "When a defendant contends that the State has refused to produce a witness's statement as required by Rule 26.2, the defendant must take action to have the statement included in the record on appeal, or this court has nothing to review." *State v. Dalton Lister*, No. E2012-00213-CCA-R3-CD, 2013 WL 3717727, at *5 (Tenn. Crim. App., at Knoxville, July 12, 2013), *no Tenn. R. App. P. 11 application filed* (internal quotation and citation omitted). Likewise, "if the excuse for non-production is unavailability . . . the defendant must nevertheless take reasonable steps to secure the statement for the record on appeal," such as requesting a subpoena for the statement. *Id*. The Defendant has failed to take any such action with regard to the alleged statement. As such, there is nothing in the record for us to review to determine if the alleged statement exists, or contains any relevant information. Accordingly, we conclude that this issue is without merit.

### D. Inadmissible Testimony from an Expert Witness

The Defendant asserts that the trial court improperly allowed Ms. Patterson, the Our Kids nurse practitioner who testified at trial, to "compare the victim in the instant case to victims in other cases." He contends that this testimony was an issue of

---

[6] The Defendant offers a footnote in his brief that states: "Somehow, Defendant's request for *Jencks* and/or Rule 26.2 witness statements at the conclusion of [A.H.]'s testimony was left out of the transcript prepared of the trial." Without further explanation or request to supplement the record, the Defendant relies upon his Motion for New Trial as evidence that he requested the materials.

34

credibility that invaded "the sole province of the jury." The State responds that the trial court properly admitted the testimony.

Ms. Patterson was admitted as an expert witness without objection. In the "Impression" section of her report, she states: "the anogenital exam is without acute or chronic signs of trauma. This in no way negates the possibility of sexual contact and is the expected finding in the vast majority of cases of child sexual abuse." Ms. Patterson affirmed this finding at trial and explained that this statement was based on research conducted over the past twenty-five years in the field of child sexual abuse. She then stated that the research was consistent with the findings in the sexual abuse examinations, approximately 900 to 950 children a year, conducted at Our Kids. She explained that the genital area of the body is "very vascular." Therefore, injuries heal completely leaving no trace of a prior injury. Ms. Patterson stated that A.H.'s anogenital exam was "consistent with her history" in that the findings did not indicate "one way or the other" as to the sexual abuse allegations. Ms. Patterson confirmed on cross-examination that her findings neither confirmed nor negated the possibility of sexual abuse.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 states: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. Rule Evid. 702. Rule 703 focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and no reversal occurs on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2010*); State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scot*t, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

Upon review of the record, we cannot conclude that the trial court erred in admitting Ms. Patterson's opinion that the victim's physical examination neither confirmed nor denied the possibility of sexual penetration. Ms. Patterson was a pediatric nurse practitioner who had received specialized training in her field. Since her employment with Our Kids Center, she had performed approximately 500 physical examinations of children who were allegedly the victims of sexual abuse. Ms. Patterson testified in Maury, Davidson, and Robertson County related to her work at Our Kids. With respect to the reliability of her opinion, the record reflects that her opinion was

35

based on her personal observations, specialized knowledge, and experience.  Ms. Patterson personally conducted the physical examination of A.H..  Ms. Patterson explained that, by virtue of her experience, a finding of penetration is less common because of the elasticity of that area of the body.  Therefore, the fact that A.H.'s examination revealed no finding of injury did not rule out the possibility of penetration. It is clear from the record that Ms. Patterson was qualified to testify as an expert witness and her opinion substantially assisted the jury in understanding the results of A.H.'s examination.  Consequently, the Defendant is not entitled to relief.

## E. Refreshing Witness Recollection with an Audio Recording

The Defendant asserts that the trial court erred when it allowed the State to refresh the Defendant's wife's memory by listening to an audio recording of her interview with Detective McCallum pursuant to Tennessee Rule of Evidence 612.  The Defendant contends that Rule 612 applies only to prior written statements of a witness and not audio recordings.  The State responds that the trial court properly allowed the Defendant's wife to refresh her memory by listening to the audio portion of her interview with the police.

At trial, the Defendant's wife could not recall statements she made to Detective McCallum about the allegations involving A.H..  The State requested that the Defendant's wife be able to review her recorded statements to refresh her memory.  Over defense objection, the trial court allowed the Defendant's wife, outside the presence of the jury, to listen to the audio portion of her statements.  Upon further questioning, the Defendant's wife recalled some of her statements to Detective McCallum but could not recall the Defendant's statements to her at the sheriff's department.

In Tennessee, admissibility of evidence is within the sound discretion of the trial judge.  *State v. Saylor*, 117 S.W.3d 239, 247 (Tenn. 2003).  In making these decisions, the trial court must consider "the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial." *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). We will only disturb an evidentiary ruling on appeal when it appears that the trial judge arbitrarily exercised his discretion.  *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

Tennessee Rules of Evidence 612 and 613 establish the circumstances and procedures for refreshing the memory of a witness using a prior statement of the witness. Tennessee Rule of Evidence 612 explains the procedures when a witness uses a writing to refresh his or her memory:

If a witness uses a writing while testifying to refresh memory for the purpose of testifying, an adverse party is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony, the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires; in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

The Advisory Commission Comment to Rule 612 explains the foundation necessary and procedure to be used when the memory of a witness is refreshed by a writing:

> Only if a witness's memory requires refreshing should a writing be used by the witness. The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory.

Tenn. Rule Evid. 612, *Advisory Comm'n Cmt*. Tennessee Rule of Evidence 612 only applies if a witness uses a writing while testifying. "By its express terms, Rule 612 pertains only when a witness uses a writing 'while testifying' to refresh memory for the purpose of testifying. Rule 612 does not apply to a writing read before trial if the writing is not also used while the witness is on the stand." NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE, § 6.12[3][b] (4th ed.2000).

The State notes that in *State v. William Pierre Torres*, No. E1999-00866-CCA-R3-DD, 2001 WL 245137 (Tenn. Crim. App., at Knoxville, March 13, 2001), *rev'd in part on other grounds by State v. Torres*, 82 S.W.3d 236 (Tenn. 2002), this Court addressed the scope of Rule 612:

> The Tennessee Rules of Evidence address the problem of refreshing a witness' memory in Tenn. R. Evid. 612, entitled "Writing Used to Refresh Memory." Interestingly, Rule 612 and the Advisory Commission Comments do not refer to the use of other materials to refresh a witness' memory, and this court has previously observed that it is unclear whether

> Rule 612 extends to the use of recordings. *State v. Harrison Pearson*, No. 03C01-9802-CR-00076, 1999 WL 692877, at*5 (Tenn. Crim. App. at Knoxville, August 31, 1999), *perm. to appeal denied*, (Tenn. 2000). In any case, Rule 612 does not explicitly prohibit the use of other materials, including recordings, to refresh a witness' memory, and, arguably, a recording such as the one at issue in this case is simply a modern substitute for handwritten notes. Moreover, this court has approved the use of a transcript of a recording to refresh a witness' memory under Tenn. R. Evid. 612. *State v. David Eric Price*, No. E1999-02684-CCA-R3-CD, 2000 WL 1015914, at *21 (Tenn. Crim. App. at Knoxville, July 25, 2000); *see also State v. Elrod*, 721 S.W.2d 820, 822-823 (Tenn. Crim. App. 1986).

*Torres,* 2001 WL 245137 at *35. Although the defendant's challenge in *Torres* was based on a violation of the Confrontation Clause, we find the reasoning in *Torres* applicable in this case. We acknowledge that Rule 612 does not address materials other than writing; however, we cannot conclude that the medium used for documenting a statement during a police investigation would preclude its use for the purposes of refreshing a witness's memory of their own statement.

In the present case, the trial court did not err in applying Rule 612. The State established the witness's need to refresh her memory, and the witness listened to her statements outside the presence of the jury and then testified without the aid of the recording. *See State v. Dishman*, 915 S.W.2d 458, 461 (Tenn. Crim. App. 1995). Therefore, we conclude that the trial court did not abuse its discretion when it allowed the Defendant's wife to refresh her memory by listening to, rather than reading, her statements made at the sheriff's department. The Defendant is not entitled to relief.

### F. Sufficiency of the Evidence

The Defendant claims the evidence presented was not sufficient to support his convictions for four counts of rape of a child and two counts of child abuse.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the

absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

## 1. Rape of a Child

The Defendant argues that there is insufficient evidence to sustain his four convictions for rape of a child because the State failed to prove penetration. He states that Ms. Patterson testified that there were no physical signs of rape during A.H.'s physical examination and A.H. never explained her understanding of a "private part." The State responds that there was sufficient evidence upon which a jury could find, beyond a reasonable doubt, that the Defendant raped A.H. on four occasions.

A conviction for rape of a child requires: (1) "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim" and (2) the victim is "more than (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2014). Tennessee Code Annotated section 39-13-501(7) (2014) defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . ."

The State made the following election of offenses following the proof at trial:

[Count] Number 1, rape of a child. [The Defendant] while in the living room near or on his recliner forced his penis into [A.H.]'s mouth. She was about five years old at the time. And she was standing. This was approximately between November 1st of 2011 and December 25th of 2011.

Count Number 2, rape of a child. In the back bedroom near or on the bed, [the Defendant] put his penis in [A.H.]'s mouth and she saw white stuff come out and wiped it up with clothes. This was during or before spring break of 2012. [A.H.] was about five years old.

Count Number 3, rape of a child. In [the Defendant]'s recliner, he put his penis inside [A.H.]'s vagina and it hurt. This was during or before spring break of 2012. [A.H.] was about five years old.

Count 4, rape of a child. In [the Defendant]'s room, he put his penis inside [A.H.]'s vagina and it hurt. This was during or before spring break of 2012. [A.H.] was about five years old.

The evidence, viewed in the light most favorable to the State, showed that five-year-old A.H., pursuant to a parenting plan, stayed at the Looney residence. Following spring break 2012 when the children stayed at the Looney residence, A.H. became

40

withdrawn and displayed behaviors inconsistent with her normal behavior and personality. When questioned about these changes, A.H. disclosed the Defendant's physical contact with her. While at the Looney residence, the Defendant penetrated A.H.'s vagina with his penis while she sat on his lap. She described this incident as painful (Count 3). In the Defendant's bedroom, the Defendant also penetrated A.H.'s vagina with his penis causing pain (Count 4). A.H. described her "private parts" and the Defendant's "private part" as the body parts underneath your "underpants." On another occasion the Defendant forced his penis in A.H.'s mouth. A.H. described "white stuff" that "came out" of the Defendant's penis and the Defendant wiping the "white stuff" away with clothing (Count 2). Finally, the Defendant told detectives that he awoke to find A.H. touching his penis and then placing it in her mouth (Count 1). He also told the detectives that he told A.H. to stop. The jury is entitled to weigh credibility and it heard the Defendant's explanation; by its verdict, the jury accredited the State's version of the events. *See Bland,* 958 S.W.2d at 659. Further, both the Defendant's wife and C.H. observed the Defendant's interactions with A.H., and their observations raised concern.

Accordingly, we conclude that there was sufficient evidence upon which a jury could find, beyond a reasonable doubt, that the Defendant sexually penetrated A.H., who was five years old at the time, on four separate occasions. The Defendant is not entitled to relief as to this issue.

## 2. Child Abuse

The Defendant contends that because there was no proof of the statutory ailments listed in Tennessee Code Annotated § 39-11-106(a)(2) (2014), the convictions for child abuse cannot stand. The State responds that the statute allows for both external manifestations such as cuts and abrasions as well as internal manifestations such as physical pain or temporary illness. Therefore, the State's proof regarding physical pain inflicted by the Defendant is sufficient to sustain the convictions for child abuse related to J.H. and C.H..

Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." T.C.A. § 39-15-401(a) (2014). This offense is a misdemeanor unless the child eight years or younger, then the offense is a felony. *Id.* Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" T.C.A. § 39-11-106(a)(2).

The State made the following election of offenses at trial:

Count Number 7, child abuse. At a time when [J.L.] fell out of his playpen, [the Defendant] kicked and punched [C.H.]. [C.H.] was about seven years old. [C.H.] said it hurt when he was kicked.

Count 8, child abuse. At a time during spring break, [the Defendant] held [J.H.] by the neck and off of the floor for leaving the T.V. on. [J.H.] was about nine years old. [J.H.] said that there were marks on his neck, and he felt like he was going to die.

The evidence, viewed in the light most favorable to the State showed that, during spring break 2012, the Defendant entered the back bedroom where the then nine-year-old J.H. and seven-year-old C.H. slept. He had earlier instructed the boys to turn off the television before going to sleep, but the boys fell asleep leaving the television on. The Defendant grabbed J.H. by the back of the neck and picked him up off the ground, causing J.H. to fear for his life. C.H., startled awake by J.H.'s screams, attempted to intervene and protect his brother but was swatted away by the Defendant. Ultimately, the Defendant dropped J.H. from his grip, causing J.H. to fall and hit his head against the wall. The Defendant's grip on J.H.'s neck caused continuing pain after the Defendant had released J.H. from his grip.

The evidence also showed that, while C.H. was seven years old, he was watching J.L. at the Defendant's request. When J.L. escaped from his playpen and hurt himself, the Defendant attacked both J.H. and C.H. for the lapse in supervision. The Defendant kicked and punched C.H., causing him pain.

The Defendant contends that Tennessee Code Annotated section 39-15-106(a)(2) requires that the State show both "a cut, abrasion, bruise, burn or disfigurement" and "physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Our review of the statute and the case law does not comport with the Defendant's interpretation of the statute. This Court has on numerous occasions recognized that a victim suffered bodily injury due to physical pain. *See State v. Dorothy Denise Cross*, No. E2013-02133-CCA-R3-CD, 2014 WL 4748337 at *5 (Tenn. Crim. App., at Knoxville, Sept. 25, 2014), *no Tenn. R. App. P. 11 application filed* (the victim suffered from physical pain when the defendant hit the pregnant victim in the arms and legs, pulled the victim's hair, and pushed the victim causing both the victim and defendant to fall down two steps on the porch, resulting in the victim having pain in her right leg, lower back, and hips); *State v. Charles Justin Woosley,* No. M2013-00578-CCA-R3-CD, 2013 WL 6188620 (Tenn. Crim. App., at Nashville, Nov. 26, 2013), *no Tenn. R. App. P. 11 application filed* (the victim suffered physical pain when the victim had a scratch on her finger and had soreness in her shoulders and arms after the crime); *State v. Toomes,* 191 S.W.3d 122 (Tenn. Crim. App. 2005), (the victim suffered physical

42

pain when she was raped, and the victim testified that "her lower organs 'kindly hurt' and that she 'just knew [she] burned and hurt down there'. . . ."); *State v. Terry Clark,* No. M2003-01925-CCA-R3-CD, 2004 WL 315141 at *2 (Tenn. Crim. App., at Nashville, Feb. 19, 2004), *no Tenn. R. App. P. 11 application filed* (the victim suffered physical pain when he was kicked in the leg, and the victim testified that the injury "hurt at the time," even though the injury did not leave a bruise); *State v. Joseph Lee Bernell Bryant*, No. 01C01-9705-CR-00194, 1998 WL 301722 (Tenn. Crim. App., at Nashville, June 10, 1998), *perm. app. denied* (Tenn. Jan. 25, 1999) (the victim suffered physical pain when appellant hit the victim's head on a wall, the victim blacked out temporarily, and the victim suffered from lower back pain and tenderness of the spine after the encounter); *State v. Smith*, 891 S.W.2d 922, 928 (Tenn. Crim. App. 1994) (the victim suffered physical pain both in her chest when appellant put his entire body weight on her chest and when appellant penetrated her vagina).

Accordingly, we conclude that there was sufficient evidence upon which a jury could find, beyond a reasonable doubt, that the Defendant knowingly inflicted physical pain on both C.H. and J.H.. The Defendant is not entitled to relief as to this issue.

## G. Juror Exposure to Pretrial Publicity

The Defendant asserts that because "none of the jurors affirmatively responded to questions regarding prior knowledge of [the Defendant]," "it is clear" there is an issue of impartiality with the jury. The Defendant relies on Juror 8's statement during questioning about the newspaper in the jury room that another juror had admitted to seeing pretrial publicity about the case. The Defendant does not identify this juror, the basis of the pretrial publicity allegedly within the juror's knowledge, or what, if any, is the resulting prejudice to him. The State correctly notes that the Defendant makes no citation to the record in reference to this issue. The rules of our Court clearly state that "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Crim. App. 10(b)*; State v. Killebrew*, 760 S.W.2d 228, 231 (Tenn. Crim. App. 1988). We conclude, therefore, that the Defendant has waived our review of this issue.

## H. Consecutive Sentencing

The Defendant contends that consecutive sentencing in this case is in direct contravention of the Sentencing Act. The State responds that the trial court properly based its decision to impose consecutive sentencing on Tennessee Code Annotated section 40-35-115(b)(5) (2014).

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2014); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. In other words, so long as the trial court sentences a defendant within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As it relates to this case, the trial court found the following criteria applicable:

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

T.C.A. § 40-35-115. These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing

44

principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4).

We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432S.W.3rd 851, 860 (Tenn. 2013).

The trial court held a sentencing hearing and the State submitted the presentence report and victim statements for entry into evidence. Father testified that he believed that his entire family was a victim of the Defendant's crimes because of the impact on their family. He explained that psychologist visits for all three children and on-going medical supervision for A.H. had placed strain on the family unit. He said that he and his wife were "trying to do the parenting thing together" but that these circumstances had caused "a big rift" in their family life. In Father's victim statement, about the residual mental damage to his children, he stated:

> Each child is suffering emotional injuries. They are all under the care of a physiologist and have attended multiple sessions. The doctors can tell us about the healing of the physical wounds but can only speculate about the long term effects of the emotional wounds. [A.H.] now has a fear of anyone wearing camouflage because she associates that with what [the Defendant] usually wore. [A.H.] also is very wary of being left alone with an unfamiliar male. Each child has nightmares and expresses fear about having to be reunited with [the Defendant] even though they know he is in jail. [C.H.] is experiencing behavioral problems at school which no doubt are a result of his intimidation by [the Defendant]. I don't know if I can ever give back to them what [the Defendant] has taken away. And that troubles me because it was not their fault in any way.

Following the sentencing hearing, the trial court issued a sentencing order and finding of fact. In it, the trial court stated the following:

> In determining the appropriate sentence, the Court has considered the evidence presented at the trial and sentencing hearing, the presentence report, the principles of sentencing and arguments made as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, any evidence and information offered by the parties regarding mitigating and enhancing factors, any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar

45

offenses in Tennessee, and the Defendant's potential for rehabilitation or treatment.

. . . .

The Court has considered the fact that [the Defendant] has been convicted of four (4) statutory offenses involving sexual abuse of a minor, and has further considered that the victim was his five year-old step-daughter. The nature and scope of the sexual acts included oral and vaginal penetration. The Court has further considered the testimony of the victim's father regarding the severe, residual mental damage that these offenses have caused to the victim.

The trial court sentenced the Defendant as a Range I, standard offender, to serve twenty-five years for each of the rape of a child convictions, two years for the felony child abuse conviction, and eleven months and twenty-nine days for the child abuse conviction. As to alignment of sentences the trial court ordered that Counts 1 and 2 (rape of a child) run consecutively to each other and all other counts concurrent, for a total effective sentence of fifty years.

We conclude the trial court properly imposed consecutive sentencing based on factor (5). The Defendant stands convicted of two offenses involving rape of a child. Therefore, the Defendant clearly meets the first prerequisite for factor (5)'s application. *See* T.C.A. 40-35-115(5). The Defendant was A.H's her step-father and the abuse occurred while A.H. was in the Looney residence for visitation pursuant to a parenting plan. The record, therefore, supports the trial court's finding that the relationship between A.H. and the Defendant favored consecutive sentencing. Because A.H. testified to at least three different occasions when the Defendant sexually assaulted her, and the Defendant acknowledged to detectives a fourth occasion, the record does not preponderate against the trial court's finding that the nature and scope of the sexual acts justified consecutive sentencing. Finally, according to the victim impact statement, at the time of sentencing the victim was receiving ongoing treatment as a result of these offenses and displayed fear in various social settings as well as nightmares. Therefore, the record does not preponderate against the trial court's finding that A.H.'s residual mental damage justified consecutive sentencing.

In summary, the Defendant was convicted of four statutory offenses involving sexual abuse of a minor, and the trial court found all but one of the additional factor (5) considerations weighed in favor of consecutive sentencing. We conclude, therefore, that the trial court properly imposed consecutive sentencing based on factor (5). Accordingly,

we affirm the trial court's application of consecutive sentencing.  The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE